479 F.2d 410
 In the Matter of BECK INDUSTRIES, INC., in Proceedings for
the Reorganization of a corporation, Debtor.
Jack FELDMAN et al., Appellants,
v.
TRUSTEES OF BECK INDUSTRIES, INC., Appellees.
 No. 582, Docket 72-2277.
 United States Court of Appeals,
Second Circuit.
 Argued March 20, 1973.
Decided April 30, 1973.
 
 Donald N. Rothman, Baltimore, Md. (Robert E. Sharkey, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Ober, Grimes & Schriver, Baltimore, Md., Winer, Neuburger & Sive, New York City, of counsel), for appellants.
 Milton S. Gould, New York City (Martin I. Shelton, Herman A. Bursky, Shea Gould Climenko & Kramer, New York City, of counsel), for appellees.
 Before SMITH, FEINBERG and MANSFIELD, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 The issue on this appeal is whether the Bankruptcy Court had jurisdiction under 11 U.S.C. Secs. 511[1] and 516(4)[2] to restrain Maryland state court proceedings against a wholly-owned subsidiary of the debtor in Chapter X proceedings, Beck Industries, Inc. (hereinafter "Beck"). The subsidiary, Webster Clothes, Inc. (hereinafter "Subsidiary"), had been newly created by Beck for the purpose of entering into a corporate acquisition but subsequent to the acquisition the Subsidiary also was a self-sustaining, viable, autonomous entity engaged in the conduct of its own business, which was separate and distinct from that of Beck. Judge John M. Cannella affirmed the order of Referee Asa Herzog who, by restraining the Maryland court proceedings, in effect found that the assets of Subsidiary constituted "property" of Beck within the meaning of the Bankruptcy Act and thus that the Bankruptcy Court had jurisdiction. The decision was based on the premise that Subsidiary was a mere adjunct or instrumentality of the debtor, permitting the court to disregard its separate corporate existence and pierce the corporate veil. For reasons stated below, we find that the Bankruptcy Court was without jurisdiction to restrain the Maryland court proceedings and we therefore reverse the restraining order.
 
 
 2
 *****
 
 
 3
 * * *
 
 THE FACTS
 
 4
 The record, which consists of various affidavits and documentary exhibits, reveals the following:[3] In early 1969, negotiations were conducted between Beck, which was a conglomerate, Webster Clothes, Inc. (hereinafter "Webster-Md."), which was a Maryland corporation, and the latter's stockholders regarding the acquisition by Beck of Webster-Md., a long-established, closely-held, going corporate concern engaged in the manufacture and the sale of men's clothing. The form of the transaction was to be a triangular three-party merger, which would conform to the requirements for a hybrid "Type A" form of tax-free reorganization as prescribed by the Internal Revenue Code, 26 U.S.C. Secs. 368(a)(1)(A) and 368(a)(2)(D).[4] The hybrid "Type A" merger permits a subsidiary to exchange its parent's stock for shares of a third corporation being acquired in a statutory merger in which the third corporation is merged into the subsidiary. Such a transaction qualifies as a tax-free "A" reorganization if: (1) none of the subsidiary's stock is used, and (2) the exchange would have been an "A" type reorganization if the acquired corporation had merged directly into the parent. Here Webster-Md. was to be merged into Subsidiary, which would be newly formed for the purpose. Subsidiary would acquire the property of Webster-Md., giving to the Webster-Md. stockholders shares of Beck stock in exchange for their Webster-Md. stock.
 
 
 5
 *****
 
 
 6
 * * *
 
 
 7
 *****
 
 
 8
 * * *
 
 
 9
 The transaction was set forth in two documents, both dated May 6, 1969: (1) the Plan and Agreement of Reorganization (hereinafter "Plan & Agreement") which was entered into by Webster-Md., its stockholders, Beck, and Subsidiary;[5] and (2) the "Articles and Agreement of Merger" (hereinafter "Merger Agreement") which was entered into between Subsidiary and Webster-Md.
 
 
 10
 Under the terms of these documents, Webster-Md. was to be merged into Subsidiary, which would become the surviving corporation. The Webster-Md. stockholders would receive approximately $2.5 million worth of Beck stock, or 84,388 shares, in immediate payment for their Webster-Md. stock. In the event that on December 31, 1971, the market value of 84,388 shares of Beck stock should be less than 150% of its market value on May 6, 1969, then according to an "Adjustment of Consideration" (set forth in the Plan & Agreement), Subsidiary would make a deferred payment to Webster-Md.'s former stockholders by delivering to them sufficient additional shares of Beck stock to increase the total value of Beck shares held by them to 150% of the value of such shares on May 6, 1969.
 
 
 11
 The Plan & Agreement sets forth a series of obligations and warranties that extend from both Beck and Subsidiary to Webster-Md. and to the latter's stockholders. In Paragraph 3(f) Beck undertook, should the provisions of the "Adjustment of Consideration" be invoked, to apply to the American Stock Exchange ("AMEX") for the listing of additional shares and covenanted to "take such steps as may be necessary to maintain the existence and solvency of Beck Subsidiary." In Paragraph 6 of the Plan & Agreement Beck and Subsidiary make a series of parallel representations and warranties. For instance, Paragraph 11(e) provided: "BECK and BECK Subsidiary hereby agree to indemnify and hold harmless the stockholders against and in respect of any and all damage, deficiency, loss, claims, demands, actions, suits, proceedings, judgments and assessments . . . resulting from any misrepresentations, breach of warranty or nonfulfillment of any agreement, obligation or covenant to be performed by Beck or Beck Subsidiary. . . ." (emphasis added). Correspondingly, Beck and Subsidiary received in Paragraphs 1(a-d) certain assurances and remedies from Webster-Md. and its stockholders.
 
 
 12
 On July 10, 1970, the American Stock Exchange suspended trading in Beck Common Stock and thereafter its shares were traded only in the Over-the-Counter market. On May 27, 1971, Beck filed a petition for reorganization under Chapter X of the Bankruptcy Act, which was approved by order of the district court on that date. In addition to the appointment of the Trustees and the delineation of their powers and duties the order restrained all persons from interfering with the Bankruptcy Court's exclusive jurisdiction over the debtor and its property.[6]
 
 
 13
 Needless to say, on December 31, 1971, the 84,388 Beck shares received by Webster-Md.'s former stockholders were not worth 150% of their value on May 6, 1969, and because of the Chapter X proceeding Beck was unable to comply with the "Adjustment of Consideration" as set forth in the Plan & Agreement.
 
 
 14
 On January 13, 1972, Jack Feldman, et al.,[7] the appellants (hereinafter "the Feldmans"), who, as the former owners of about 65% of the Webster-Md. shares, were participants in the merger, instituted an action in the Circuit Court of Baltimore City, Baltimore, Maryland, against Subsidiary by filing a Bill of Complaint which sought, among other things, to cancel and rescind the Merger Agreement. Neither Beck nor its Trustees were named as defendants. In Count I of the Bill, the Feldmans claimed that the inability of Subsidiary to deliver additional shares of Beck stock having the value required by the "Adjustment of Consideration" provisions of the Plan & Agreement
 
 
 15
 "constitute[d] a total failure of the consideration promised to Plaintiffs [the Feldmans] by the Defendant in exchange for the delivery by the Plaintiffs of all their stock in Webster-Md. to the Defendant and in consideration for Plaintiffs' actions which caused Webster-Md. to agree to the merger of Webster-Md. into the Defendant."
 
 
 16
 The prayer for relief sought the cancellation and rescission of the Merger Agreement, the return to the Feldmans of the shares necessary to restore them to their prior percentage of equity in Webster Clothes (65%) and an accounting.
 
 
 17
 Under Paragraph 11(e) of the Plan & Agreement, Count II sought indemnification by Subsidiary for damages and losses "resulting from the breach or non-fulfillment of any agreements, obligations or covenant to be performed by Beck under the Plan & Agreement or Merger Agreement" including the prorata share of $2.7 million. In Count III, essentially the same relief was sought, this time based on Subsidiary's breach of its own covenants under Paragraph 11(e). Count IV sought damages in the sum of $2,425,746.63.
 
 
 18
 The Baltimore Circuit Court, upon the Feldmans' ex parte motion, issued an order enjoining Subsidiary, "its officers, agents, servants, employees, and attorneys, and all other persons in active concert and participation with it from doing any of . . ." an enumerated list of acts which might facilitate the depletion of Subsidiary's assets by Beck. Neither the Bill of Complaint nor the ex parte petition for injunctive relief named Beck as a defendant.
 
 
 19
 The instant action arose from the Trustees' attempt to enjoin the Maryland proceedings. Although the Maryland proceedings failed to name Beck as a defendant and were directed against Subsidiary, the Trustees of Beck, on January 21, 1972, claiming a violation of the Chapter X protective order[8] prayed for an order to show cause why the Feldmans "should not be enjoined from taking any further steps or actions in the Maryland proceedings and why they should not be restrained from in any other manner interfering with the possession or management by the Trustees of the estate. . . ." On the same date Judge Cannella signed the order to show cause containing a provision staying until his hearing of the issue any further steps in the Maryland proceedings and ordering the respondents (the Feldmans) to vacate the ex parte Maryland order. By stipulation filed on January 25, 1972, the Feldmans agreed to vacate the Maryland ex parte order and the Trustees agreed to refrain from entering into any unusual transactions with Subsidiary.
 
 
 20
 In a decision dated April 19, 1972, Referee Herzog granted the motion to restrain further proceedings in the Maryland action. Conceding the validity of the general rule "that Section 116(4) does not authorize the Chapter X court to enjoin prosecution of a suit against a wholly independent subsidiary . . ." the Referee found that the "equities demanded departure from the general rule" because Subsidiary is "an independent entity by virtue of the sheerestfiction" and "was a mere adjunct or instrumentality" of Beck, and as such, the corporate veil which separated Beck and Subsidiary should be pierced, at least with regard to the instant transaction with the Feldmans. By so doing, the Bankruptcy Court, exercising its jurisdiction under Secs. 511 and 516(4), was able to reach the Maryland action.
 
 
 21
 On September 26, 1972, Judge Cannella, essentially approving Referee Herzog's reasoning, affirmed the order and pierced the corporate veil. The question before us is whether the Bankruptcy Court had jurisdiction to enter the injunction.
 
 THE LAW
 
 22
 Under 11 U.S.C. Sec. 511 the Bankruptcy Court in Chapter X proceedings has "exclusive jurisdiction of the debtor and its property, wherever located." Section 516(4) provides in pertinent part that the court may "enjoin or stay until final decree the commencement or continuation of a suit against the debtor or its trustee or any act or proceeding to enforce a lien upon the property of the debtor" (emphasis added). In determining whether Subsidiary or its assets constitute "property" of the debtor within the meaning of the Act, we must note that Beck's sole interest in Subsidiary is its ownership of Subsidiary's outstanding stock. Ownership of all of the outstanding stock of a corporation, however, is not the equivalent of ownership of the subsidiary's property or assets. See In Re Gobel, Inc., 80 F.2d 849, 851 (2d Cir. 1936); Klein v. Board of Tax Supervisors, 282 U.S. 19, 23-24, 51 S.Ct. 15, 75 L.Ed. 140 (1930); Liman v. Midland Bank Ltd., 309 F.Supp. 163, 167 (S.D.N.Y.1970). Even though the value of the subsidiary's outstanding shares owned by the debtor may be directly affected by the subsidiary's disputes with third parties, "Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate." Callaway v. Benton, 336 U.S. 132, 142, 69 S.Ct. 435, 441, 93 L.Ed. 553 (1949).
 
 
 23
 Consistent with this approach is the general rule-upon which the parties, the Referee and the District Judge agree-that Sec. 516(4) of the Bankruptcy Act does not authorize the Chapter X court to enjoin a suit against a solvent independent subsidiary of the debtor merely because its stock is held by the debtor in reorganization. See In Re Gobel, Inc., supra; In Re South Jersey Land Corp., 361 F.2d 610 (3d Cir. 1966); 6 Collier on Bankruptcy, p 3.11 at 501; cf. Greenbaum v. Lehrenkrauss Corp., 73 F.2d 285 (2d Cir. 1934) (equity receiver of parent could not enjoin a suit against the subsidiary).
 
 
 24
 The foregoing general rule was established as the law of this Circuit in the leading case of In Re Gobel, Inc., supra, where we reversed a district court order which had enjoined certain state court proceedings directed at the debtor's subsidiary. Gobel, Inc., the debtor in the bankruptcy proceedings, had voted the common stock of its subsidiary, Decker & Sons, in favor of a sale of Decker's assets to Armour & Co. The appellant therein, which had leased certain equipment to Decker, sought to compel Decker to establish a fund to pay-off the lease (which Armour had refused to assume) and later sought damages for breach of the lease. We found that the Bankruptcy Court had no jurisdiction to restrain the action against Decker, stating "it is plain that the suit was not against this debtor nor was it a judicial proceeding to enforce any lien upon its estate. The assets of the Decker corporation were involved, not the Decker stock, which was part of the debtor's estate. . . . But mere financial interest of a bankrupt estate in the outcome of the litigation pending in state courts does not authorize the issuance of an injunction against such prosecution." 80 F.2d at 852. Gobel was followed as recently as 1966 in In Re South Jersey Land Corp., supra, and no basis is offered for rejecting its reasoning, which is not seriously questioned. In Re Federal Biscuit Co., 203 F. 37 (2d Cir. 1913), and In Re Collier, 4 F.Supp. 700 (S.D.N.Y.1933), which are relied upon by the debtor, are clearly distinguishable. There the third party's enforcement of its rights would, unlike the situation here, result in seizure and sale of property owned by the debtor, which had been deposited by it to secure a surety bond.
 
 
 25
 Absent a showing by the Trustees that Subsidiary was a mere sham or alter ego of Beck, the present case is governed by Gobel, since the Maryland suit herein is directed solely against Subsidiary and not against any property of the debtor (Beck). If rescission were granted in the Maryland action, Subsidiary would be ordered to return to Webster-Md. the assets which Subsidiary had obtained from Webster-Md. as a result of the merger and to return to the former Webster-Md. stockholders the Webster-Md. shares which Subsidiary had received from them in exchange for the 84,388 Beck shares transferred by it to them. In return Subsidiary would receive back the 84,388 shares of Beck stock, which concededly are worth very little. Beck would still own the stock of Subsidiary, but the assets of Subsidiary would be worth much less. If, rather than rescission, damages were granted, Beck would still own the stock of Subsidiary, but the value of Subsidiary would be reduced by a sum approximating the amount of the damages. In either event Beck would not be deprived of its property, i. e., Subsidiary's outstanding shares. Admittedly there is no attempt by the Maryland plaintiffs to impress a lien upon the shares of Subsidiary owned by its parent-debtor (Beck) or to obtain relief against the debtor. The sole effect of a judgment against Subsidiary, therefore, would be to lower the value of Subsidiary's outstanding shares.[9] Thus, under traditional reasoning the dispute between appellants and Subsidiary is a controversy which might affect the worth of the debtor's estate, see Callaway v. Benton, supra, but not title to its "property."
 
 
 26
 In short, absent proof that Subsidiary was a mere sham or conduit rather than a viable entity, the Maryland suit is not a "proceeding to enforce a lien upon the property of the debtor" as that phrase is used in Sec. 516 of the Bankruptcy Act and the Bankruptcy Court therefore lacks jurisdiction. Apparently accepting the view that under the general rule the district court would not have the power to issue injunctive relief at the instance of the parent debtor with respect to its Subsidiary's dealings with third persons, the Trustees of the debtor argue, and Referee Herzog and Judge Cannella agreed, that Subsidiary's separate corporate existence should be treated as a sham or mere formal technicality permitting the court to pierce the corporate veil and treat Subsidiary's property as that of the parent-debtor (Beck), at least for the purpose of restraining appellants' Maryland suit. In their view Subsidiary is not a distinct and separate entity from Beck but merely its instrumentality, newly created solely as a means of consummating the merger in a way that would benefit the stockholders of Webster-Md. but not with a view to conferring any benefit on Beck. Upon this assumption the Bankruptcy Court swept aside the corporate veil in the interest of getting to what it believed to be the substance of the transaction and of the resulting relationship of the parties.
 
 
 27
 Were we to accept the factual premises underlying the decisions of the Referee and of the district court, we would have no difficulty agreeing with their conclusion. It must be conceded that the general rule against enjoining a suit against a solvent subsidiary of the debtor is not inflexible, see 6 Collier on Bankruptcy p 3.11 at 500 (14th ed. 1972) and that the meaning of the term "property" turns on the particular facts of each case, see In Re South Jersey Land Corp., supra, 361 F.2d at 613, which may in some instances permit piercing of the corporate veil. However, where a debtor seeks to pierce that veil on the ground that its subsidiary is a mere dummy or alter ego, the burden of proof is on the debtor. Upon the record before us the Trustees failed completely to sustain that burden. On the contrary, it is apparent that Subsidiary was formed for the mutual benefit of the parties and that thereafter, far from being a "mere instrumentality" of Beck, it operated as a viable, independent going commercial concern.
 
 
 28
 While Subsidiary may have been a mere shell when, immediately prior to the merger, it was formed and the transaction was structured to conform to the hybrid "Type A" form of corporate reorganization, Internal Revenue Code, 26 U.S.C. Secs. 368(a)(1)(A) and 368(a)(2)(D), the proof is clear and undisputed that ever since the merger it has functioned as a self-sustaining enterprise, which conducts the going business of Webster Clothes, Inc. Since the merger Subsidiary, furthermore, has operated that business in substantially the same manner as it had been operated prior to the merger. It has traded under its own name (Webster Clothes, Inc.), has had its own separate assets, creditors and obligations, and has consistently held itself out to the general public and trade creditors as a business separate and distinct from Beck. In Maryland it has assets customarily associated with active clothing concerns, including leasehold interests in retail stores, its clothing factory, fixtures, equipment, inventory and bank accounts. There has been no commingling of assets between Beck and Subsidiary. There is no evidence that Subsidiary has had grossly inadequate capital, that the debtor-parent pays its debts, or that its sources of business is dependent in any way upon that of its parent. Nor is there any indication that in the conduct of its affairs since the merger Subsidiary's separate and independent corporate entity has been disregarded.
 
 
 29
 Thus, at least subsequent to the merger, it is hardly open to dispute that Subsidiary has been a vital and viable independent entity. We cannot accept or agree with the Referee's characterization of Subsidiary as a "devious . . . legal rigamarole," and "independent entity by the sheerest fiction," and an "adjunct or instrumentality of the parent, Beck." These conclusions, being unsupported by the record, are clearly erroneous. On the contrary, the record reveals a carefully constructed commercial transaction in which parties of relatively equal bargaining strength, represented by able counsel, negotiated and bargained for a distinct operating subsidiary that was to conduct its own independent business.
 
 
 30
 Both the Plan & Agreement and the Merger Agreement carefully delineated a transaction through which the business of Webster Clothes would continue to be carried on by Subsidiary as a separate bona fide operating entity. Moreover, Subsidiary and Webster-Md. bargained for and received from each other reciprocal rights and assurances, distinct from Beck's rights and obligations. Paragraph 11(e), supra, of the Plan & Agreement provided that "Beck and Beck Subsidiary" (emphasis added) would each separately indemnify and hold harmless the Webster-Md. stockholders against losses, damage and the like. Correspondingly, the representations made by the stockholders were for the benefit of both Beck and the Beck Subsidiary. See, e. g., Paragraph 11(d) of Plan & Agreement.
 
 
 31
 The background of the parties' creation of separate and distinct obligations is clear. Beck did not want to pay immediately the full agreed-upon price, which would require transfer at once of Beck shares worth approximately $3.75 million for Webster-Md.'s outstanding shares. Instead it wanted to exchange Beck shares worth approximately twothirds of the price at the time of the merger, i. e., $2.5 million, and defer payment of the balance until December 31, 1971, in the hope that by that time the value of the Beck shares might appreciate to $3.75 million, which would render unnecessary transfer of additional Beck shares. The Webster-Md. stockholders, on the other hand, wanted to be assured that if no such appreciation in value of the Beck shares should occur they would receive from Subsidiary, to which Webster-Md.'s assets would in the meantime have been transferred, the balance of the purchase price. It was part of this arrangement that Subsidiary, which would have acquired Webster-Md.'s assets, be maintained as a separate operating entity rather than have its assets exposed to Beck's liabilities by having Beck acquire them directly.
 
 
 32
 Nor are we persuaded that the equities, as between the debtor and the Webster-Md. stockholders, weigh in favor of disregarding Subsidiary's separate corporate existence. It is true that one of the reasons for the organization of Subsidiary as a distinct entity was to shape the contours of the transaction to conform to Internal Revenue Code, Secs. 368(a)(1)(A) and 368(a)(2)(D), so that the Webster-Md. stockholders could defer recognition for tax purposes of the gain, with the Beck shares received by them having the same tax basis as the Webster-Md. shares exchanged by them. See 26 U.S.C. Secs. 354(a)(1) and 358(a)(1). At the same time the Webster-Md. stockholders minimized the risk of their not receiving any deferred payment to which they might become entitled on December 31, 1971, by obtaining Subsidiary's independent covenant to exchange any additional Beck shares that might come due under the provisions for "adjustment of Consideration," and by transferring the Webster-Md. assets to Subsidiary rather than permitting them to be commingled with Beck's property.
 
 
 33
 But Beck also stood to gain substantial benefits from the organization of Subsidiary and from the tripartite form of the transaction. A direct merger of Webster-Md. into Beck would have obligated Beck to assume all of the obligations and debts of the clothing firm. The interposition of Subsidiary, on the other hand, provided Beck with a measure of insulation from such liability. Where a parent corporation desires the legal benefits to be derived from organization of a subsidiary that will function separately and autonomously in the conduct of its own distinct business, the parent must accept the legal consequences, including its inability later to treat the subsidiary as its alter ego because of certain advantages that might thereby be gained. In short the parent cannot "have it both ways." The words of the Supreme Court in Schenley Distillers Corp. v. United States, 326 U.S. 432, 437, 66 S.Ct. 247, 249, 90 L.Ed. 181 (1946), although stated in another context, are appropriate:
 
 
 34
 "While corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages. . . ."Also, by employing this three-party transaction, Beck might have been able to treat the acquisition, for accounting purposes, as a "pooling of interests" rather than as a purchase. See ARB No. 48 (Jan. 1957) printed in 2 APB Accounting Principles 6081 (1969), amended by APB Opinion No. 16 (Aug. 1970). As such "some of the current costs of the assets, including goodwill" might not be reflected on the books of the acquiring corporation. See APB Opinion No. 16, p 35 (Aug. 1970). Finally, the form of the transaction may well have obviated the necessity of Beck's obtaining approval of the merger by its own shareholders, thereby avoiding the delay, cost and effort involved in preparing and distributing a proxy statement and of obtaining the percentage of stockholder approval required by Delaware law.
 
 
 35
 Thus, although Subsidiary was a child of the merger, it was conceived and created by the two parties as a viable operating entity pursuant to a perfectly legitimate business arrangement from which each mutually derived benefits. Under the circumstances it was error to conclude that the equities justified piercing of the corporate veil.[10] Indeed to deny the Webster-Md. stockholders the right to enforce the separate independent covenants for which they, like other creditors of Subsidiary, lawfully bargained[11] would be inequitable.
 
 
 36
 Finally, the Trustees contend that restraint of the Maryland suit will facilitate their administration of the debtor's estate, already a complicated task, since they will otherwise be forced to divert their energies to defense of that suit in an inconvenient forum in order to preserve the value of the debtor's stock interest in Subsidiary. In our view this argument puts the cart before the horse. The corporate veil cannot be disregarded merely because it would make for "an efficient and economical administration" of the debtor's estate, Greenbaum v. Lehrenkrauss, 73 F.2d 285, 287 (2d Cir. 1934). As we stated in In Re Gobel, supra: "Though facility in reorganization is desirable, it is not the sole consideration." 80 F.2d at 853. We have found that piercing the corporate veil here is not warranted. If it is desirable for the Bankruptcy Court to have jurisdiction of all litigation involving subsidiaries, solvent or not, of the debtor, the answer lies with Congress.
 
 
 37
 The order restraining the Maryland court action is reversed.
 
 
 
 [1]
 Title 11, Sec. 511 of the Bankruptcy Act provides:
 "Where not inconsistent with the provisions of this chapter, the court in which a petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and its property, wherever located."
 
 
 [2]
 Section 516(4) of Title 11 provides:
 "Upon the approval of a petition, the judge may, in addition to the jurisdiction, powers, and duties in this chapter conferred and imposed upon him and the court-
 "(4) in addition to the relief provided by section 29 of this title, enjoin or stay until final decree the commencement or continuation of a suit against the debtor or its trustee or any act or proceeding to enforce a lien upon the property of the debtor."
 
 
 [3]
 Since all of the evidence is documentary we are in as good a position as the district court to appraise and evaluate it. Orvis v. Higgins, 180 F.2d 537, 539 (2d Cir.), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950); Norment v. Stilwell, 135 F.2d 132 (2d Cir.), cert. denied, 320 U.S. 763, 64 S.Ct. 68, 88 L.Ed. 455 (1943); 5A J. Moore, Federal Practice p 52.04 (2d ed. 1971)
 
 
 [4]
 26 U.S.C. Sec. 368(a)(1)(A) provides:
 "(a) Reorganization.-
 "(1) In general.-For purposes of parts I and II and this part, the term 'reorganization' means-
 "(A) a statutory merger or consolidation. . . ."
 26 U.S.C. Sec. 368(a)(2)(D) provides:
 "(a) Reorganization.-
 "(2) Special rules relating to paragraph (1).-
 "(D) Statutory merger using stock of controlling corporation.-The acquisition by one corporation, in exchange for stock of a corporation (referred to in this subparagraph as 'controlling corporation') which is in control of the acquiring corporation, of substantially all of the properties of another corporation which in the transaction is merged into the acquiring corporation shall not disqualify a transaction under paragraph (1)(A) if (i) such transaction would have qualified under paragraph (1)(A) if the merger had been into the controlling corporation, and (ii) no stock of the acquiring corporation is used in the transaction."
 
 
 [5]
 During the negotiations Subsidiary was named "Beck-Webster Inc." Upon consummation of the merger the name was changed to "Webster-Clothes Inc." In order to avoid confusion on the part of the reader we have labelled the Delaware subsidiary "Subsidiary" throughout rather than initially call it by one name, then denominate it by another
 
 
 [6]
 The Order provided in pertinent part that all persons are:
 "enjoined and stayed from commencing or continuing any action at law or suit or proceeding in equity against said debtor or said trustees in any court, or from executing or issuing or causing the execution or issuance out of any Court of any writ, process, summons, attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with or enforcing a lien upon any property owned by or in the possession of the said debtor or said Trustees, and from doing any act or thing whatsoever to interfere with the possession or management by said debtor or said Trustees of the property and assets of the within estate, or in any way interfere with said trustees in the discharge of their duties herein, or to interfere in any manner during the pendency of this proceeding with the exclusive jurisdiction of this Court over said debtor and said trustees and their respective properties. . . ."
 
 
 [7]
 "Jack Feldman; Nancy I. Feldman Gimbel; Abraham Feldman; Lena Feldman; Julius Feldman; Selma Feldman; Helen W. Feldman; Abraham Feldman and Edward E. Obstler, Personal Representatives for Louis S. Feldman, deceased; Doris Feldman Hyatt; Leba Ann Feldman Rotker; Florence L. Kobernick; Linda D. Duritz; Rose Feldman; Norma Feldman Schrago; Bernice Elain Suser; Stephen Suser; Abraham Feldman, Trustee of Nancy Ilene Feldman Gimbel; Jack Feldman, Trustee under the Will of Edward Feldman; Mercantile Safe Deposit & Trust Co., Trustee of Suzanne Louise Feldman; Mercantile Safe Deposit & Trust Co., Trustee of Nancy Ilene Feldman Gimbel; and Mercantile Safe Deposit & Trust Co., Trustee under Will of Edward Feldman."
 
 
 [8]
 See footnote 6 supra and accompanying text
 
 
 [9]
 We express no view on the merits of the Maryland proceedings, which of course are not before us
 
 
 [10]
 The cases relied on by Beck are all distinguishable and at most stand for the proposition that the general rule is flexible, and that the corporate form will be pierced when the equities so require. For example, in Hamilton Ridge Lumber Sales Corp. v. Wilson, 25 F.2d 592 (4th Cir. 1928), a lumber manufacturing company, which was in financial difficulty, and a bank to which it was indebted, organized a sham sales corporation for the sole purpose of securing the lumber company's debt to the bank. The sales company "purchased" lumber in return for notes which were then discounted by the bank. The sales corporation never had actual possession of the lumber, had been organized solely for this one transaction, and never transacted any other business. The court, ignoring the separate corporate entities, properly found that there had been neither a valid sale nor pledge and that the transaction "was not bona fide to the extent that there was a real sale of the lumber in question. The Sales Corporation had no real business existence, had in fact no organization by which it could transact business. . . ." 25 F.2d at 594. The situation in the present case is entirely different. Subsidiary, unlike the sales corporation in Hamilton Ridge, is a bona fide going commercial concern
 
 
 [11]
 The Trustees do not argue that other creditors of Subsidiary should be deprived of their right to enforce their claims separately against Subsidiary