**In re MEGO INTERNATIONAL, INC. and Mego Corp., Debtors.**

**MEGO INTERNATIONAL, INC., Mego Corp. and Ojem, Inc., Plaintiffs-Respondents,**

v.

**PACKAGING & ASSEMBLY MANUFAC- TURING CORPORATION, Pac Packing Corporation and Phoenix Toys, Inc., Defendants-Appellants.**

**No. 83 Civ. 3157 (ADS).**

United States District Court, S.D. New York.

June 7, 1983.

Spengler, Carlson, Gubar, Brodsky, Rosenthal, New York City, for plaintiffs-respondents.

La Rossa, Axenfeld & Mitchell, New York City, for defendants-appellants.

SOFAER, District Judge:

This is an expedited appeal, brought by order to show cause, seeking to reverse a

preliminary injunction entered in favor of plaintiffs-respondents Mego International, Inc., its operating subsidiary Mego Corp. (collectively, "Mego") and Ojem, Inc. ("Ojem") by the Bankruptcy Court for the Southern District of New York (Galgay, J.). Defendants-appellants contend that the Bankruptcy Court lacked jurisdiction to enter the preliminary injunction. An order reversing the Bankruptcy Court's decision and remanding for dismissal was entered on June 3, 1983. This opinion states the reasons for that order.

Mego is in the toy business. Since filing in July 1982 a petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, it has been operating as a debtor-in-possession. As part of its reorganization effort, Mego decided to stop manufacturing toys and concentrate solely on selling and distributing such products. This strategy was hampered by potential customers' resistance to doing business with Mego in light of the company's chapter 11 status and its pre-filing contractual breaches. *See* Supplemental Record On Appeal ("Supp.R.") 7. In an attempt to overcome this difficulty, Mego entered an agreement with appellant PAC Packaging Corporation ("PAC") on January 7, 1983. This Mego/PAC Agreement provided that Mego would organize a new subsidiary, and would then cause the new subsidiary to enter into a second agreement with PAC. The second agreement, which was set out verbatim in the Mego/PAC Agreement, provided for appointment of the then nonexistent subsidiary as PAC's "exclusive marketing representative" within the United States for all of PAC's "toys, games, puzzles and dolls of all kinds and descriptions." *See* Record On Appeal ("R.") 16–28, 29–40, 284–96, 267–78.

Since the Mego/PAC Agreement was entered outside the ordinary course of Mego's business, Mego sought Bankruptcy Court approval under § 363(b) of the Bankruptcy Code, 11 U.S.C. § 363(b). On January 25, 1983 the Bankruptcy Court, after a hearing at which PAC was present, approved both the creation of the new subsidiary, called Ojem, and the terms of the sales-represent-atives agreement that were set out in the Mego/PAC Agreement. R. 299–300; Supp.R. 31–74. On January 26, 1983, Mego caused Ojem to enter the sales-representative agreement (the Ojem/PAC Agreement) with an affiliate of PAC, appellant Packaging & Assembly Manufacturing Corporation ("P & A"). R. 29–40, 267–78. PAC and P & A subsequently caused the Ojem/PAC Agreement to be assigned to another PAC affiliate, appellant Phoenix Toys, Inc. ("Phoenix"). R. 90. In a related agreement also entered on January 26, 1983, Mego granted PAC various trademark and copyright licenses and sold to PAC certain molds used for production of toys involving the licensed trademarks and copyrights. Supp.R. 75–111. This licensing and sales agreement was approved by the Bankruptcy Court on February 4, 1983. Supp.R. 73–74, 117–24.

Mego and Ojem claim that, although they had fully performed all of their obligations under the Ojem/PAC Agreement, Mego received a letter on April 7, 1983 advising it that appellants were terminating the agreement. R. 279. On April 8, 1983, Mego and Ojem commenced the adversary proceeding that led to this appeal, seeking, *inter alia,* an injunction restraining PAC, P & A, and Phoenix from distributing any toy products except in accordance with the terms of the Ojem/PAC Agreement. R. 11–15. On April 8, 1983, Mego and Ojem obtained a temporary restraining order under Fed.R. Civ.P. 65. R. 3–5. Following two days of hearings, Judge Galgay entered a preliminary injunction against all the appellants. R. 12. As defendants in the Bankruptcy Court proceeding, the appellants asserted that Ojem had failed to maintain the level of sales it had promised to achieve, but they presented no testimony in opposition to the preliminary injunction application, relying instead on the jurisdictional issue now pressed on appeal. *See* R. 259.

Appellants maintain that the Bankruptcy Court does not have jurisdiction over a contract action between a subsidiary of a chapter 11 debtor and a third party, so long as the subsidiary itself is not in bankruptcy.

They primarily rely on *In re Beck Industries,* 479 F.2d 410 (2d Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973), a case involving a Bankruptcy Court order restraining a state-court proceeding which had been brought against a bankrupt debtor's wholly-owned subsidiary. The Second Circuit reversed the restraint order because the Bankruptcy Court's exclusive jurisdiction over the bankrupt debtor and its property did not extend to "a solvent independent subsidiary of the debtor merely because its stock is held by the debtor." 479 F.2d at 415.

■ Respondents do not deny that *Beck* remains good law although decided under the old Bankruptcy Act. *See In re Clifford Resources, Inc.,* 24 B.R. 778, 780 (Bkrtcy.S.D.N.Y.1982); 2 *Collier On Bankruptcy* (15th ed.) ¶ 362.04. Respondents do contend, however, that *Beck* is distinguishable because Ojem is a mere conduit of Mego, and should be regarded as the debtor's property over which the Bankruptcy Court has jurisdiction. *See* 11 U.S.C. § 511. Respondents also assert that the Bankruptcy Court had jurisdiction inasmuch as the adversary proceeding was "supplementary" to the Bankruptcy Court's January 25 order approving both the creation of Ojem and the terms of the sales-representative agreement set out in the Mego/PAC Agreement. By contrast, the subsidiary in *Beck* had been created for the purpose of making an acquisition that the parent corporation sought to preserve two years later, after the parent had filed for protection under the bankruptcy law. Mego and Ojem further argue that, having accepted the benefits of the Bankruptcy Court's order, PAC should be required to accept enforcement of its contract with Ojem in the same court. Finally, respondents rely on the claim that jurisdiction must be found to exist if Mego is to have any chance of successfully completing a reorganization in chapter 11. While these arguments may appear to create a stronger case for Bankruptcy Court jurisdiction than in *Beck,* the principles on which *Beck* is based, and the long-run interests at stake concerning the creation of subsidiaries of chapter 11 companies, require reversal of the Bankruptcy Court injunction and dismissal of this action.

*Beck* established that the ownership of a subsidiary by a bankrupt parent does not make that subsidiary the parent's property, unless the subsidiary is "a mere sham or conduit rather than a viable entity." 479 F.2d at 416. Here Mego personnel control and operate Ojem, but that circumstance is often true of wholly owned subsidiaries, and was also apparently true of the subsidiary in *Beck.* In that case Referee Herzog had found that the "equities" required him to disregard the subsidiary's corporate form, because the subsidiary was "an independent entity by virtue of the sheerest fiction" (the subsidiary had been created for tax purposes) and "a mere adjunct or instrumentality" of the parent. 479 F.2d at 415. But the Court of Appeals rejected those conclusions on a record substantially similar to the record in this case:

> [I]t is apparent that the subsidiary was formed for the *mutual* benefit of the parties and that thereafter, far from being a "mere instrumentality" of Beck, it operated as a viable, independent going commercial concern.... It has traded under its own name ..., has had its own separate assets, creditors and obligations, and has consistently held itself out to the general public and trade creditors as a business separate and distinct from [its parent].

479 F.2d at 417. Ojem is in precisely the same situation, with its own books and records, office, creditors, and customers (other than PAC). *See, e.g.,* R. 122–23, 125–28, 146. Mego and Ojem had separate financing agreements with General Electric Credit Corporation, and Ojem's stock has been pledged by Mego to the same creditor. R. 189–90. Respondents have presented no evidence that Mego exercised any improper control which might theoretically have jeopardized Ojem's independent status.

Mego correctly points out that, unlike the subsidiary in *Beck,* Ojem was created for the purpose of entering a sales-representative agreement which provided terms spe-

cifically approved by the Bankruptcy Court. Contrary to Mego's suggestion at oral argument, however, PAC was not a party to the application to authorize a new subsidiary and approve the Mego/PAC Agreement. Supp.R. 6; *see* Transcript of Oral Argument 19, 21 (May 4, 1983); *see also* R. 8 (Mego affidavit in support of injunctive relief incorrectly stating that the Ojem/PAC Agreement "appoints *Mego and* Ojem to represent PAC"). Moreover, PAC never agreed expressly or implicitly to submit all its disputes with Ojem to the Bankruptcy Court for decision. The Mego/PAC Agreement approved by the Bankruptcy Court provided that only "Mego will immediately cause the formation of Subsidiary and immediately thereafter PAC Corporation will execute and Mego Corp. will cause Subsidiary to execute" the sales-representative agreement that became the Ojem/PAC Agreement. R. 16, 284. Neither the Mego/PAC Agreement nor the Ojem/PAC Agreement provided for Bankruptcy Court jurisdiction or supervision.

PAC's counsel claims that his client's willingness to contract with Mego for a continuing relationship was induced by the creation of a subsidiary that would be independent of the Bankruptcy Court. *See* Letter from James M. LaRossa, Esq. to the Court at 6 (May 11, 1983). Although no evidence directly supports this claim, Mego's approval application indicates that the subsidiary was proposed because Mego had encountered resistance to sale of its products once it went into chapter 11. Supp.R. 7. Indeed, Mego International's President and Chief Executive Officer specifically testified at the January 20 approval hearing that a subsidiary was necessary because customers would not deal with a company in chapter 11:

> Q. [by Daniel Golden, Esq., attorney for the Bank Creditors]: Why is it necessary to form a sub to provide these new services, sales marketing, sales representative and why can't Mego Corp. itself perform those functions?
>
> A. I think your associate asked us that at the last creditors meeting and my primary answer—the primary reason for making it as a sub is because that sub will not be in Chapter 11.
>
> Q. I assume by the response that that has an impact on your negotiations for the acquisition of the stock of Mego Corp.?
>
> A. No, being able to operate out of Chapter 11 can have a significant impact on the success of this new business.
>
> THE COURT: Putting it another way, the customers that you will be dealing with have more confidence in a non-Chapter 11 than they would a Chapter 11 entity?
>
> THE WITNESS: That's correct.

Supp.R. 47–48.

Thus, the fact that Ojem, unlike the subsidiary in *Beck,* was created in the context of its parent's reorganization effort strongly disfavors, rather than supports, Bankruptcy Court jurisdiction over Ojem's dispute with PAC. Whereas the parties to the dispute in *Beck* apparently had no specific expectations regarding the subsidiary's status in the event of its parent's bankruptcy, the evidence here suggests that PAC and other entities doing business with Ojem relied on Ojem's nonbankrupt status and the consequent expectation that disputes involving Ojem would not be subject to Bankruptcy Court jurisdiction. While a Bankruptcy Court has inherent authority to enforce its orders, *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), including its orders under 11 U.S.C. § 363(b) approving transactions outside the ordinary course of a debtor's business, the only aspect of any Bankruptcy Court order that was conceivably addressed to PAC was fully satisfied when PAC signed the sales-representative agreement with Ojem, as it had promised in the Bankruptcy-Court-approved Mego/PAC Agreement. No court order or agreement required PAC to submit disputes with Mego's nonbankrupt subsidiary to the Bankruptcy Court.

PAC has derived no advantages from the Bankruptcy Court's orders that would justify requiring it to submit to that Court's

jurisdiction. PAC agreed to contract with a nonbankrupt subsidiary and to pay the subsidiary reasonable and fair compensation for services as a sales representative. PAC also agreed to pay fair consideration ($37,-500 plus royalties) for licenses and molds for certain Mego toys. Supp.R. 73–74, 77. (In fact, PAC was the only company Mego could find that was willing to buy Mego's licenses and molds. R.Supp. 122.) Neither of these related, Bankruptcy-Court-approved agreements gave PAC any special advantages, and they were both more essential to Mego's interests that to PAC's. PAC cannot be said to have "eaten at the trough" of the Bankruptcy Court, as may be true when creditors are favored for one reason or another, or when parties are granted special permission to contract directly with the bankrupt for their financial advantage. *See In re Fabric Tree, Inc.,* 426 F.Supp. 872, 879–80 (S.D.N.Y.), *aff'd,* 558 F.2d 1069 (2d Cir.1977) (contract between third party and debtor). If PAC sought any special privilege here, it was to obtain the services of Mego personnel without contracting directly with Mego. But the only advantage PAC obtained thereby was the understanding that PAC would not be subjected to the very jurisdiction that Mego now claims is appropriate.

The need to help Mego in its effort to reorganize is an inappropriate basis bothfor Bankruptcy Court jurisdiction and for granting Ojem preliminary relief in a contract action. When a bankrupt corporation organizes a nonbankrupt subsidiary, "the parent must accept the legal consequences, including its inability later to treat the subsidiary as its alter ego because of certain advantages that might thereby be gained." *Beck,* 479 F.2d at 418. Respondents nonetheless made Mego's survival the principal basis for the relief sought in the adversary proceeding below. *See* R. 106; *see also* Respondents' Memorandum On Appeal 13 ("Mego's interest in Ojem is critical to Mego's successful reorganization. Mego therefore must be able to protect Ojem's interests in the Bankruptcy Court in this case...."). At the hearing on the request for a preliminary injunction Ojem's President conceded that damages could be calculated for PAC's alleged breach, if Ojem were to succeed on the merits. But, he said, damages were inadequate because Mego would not be around to benefit from them:

> THE COURT: I'm sure counsel will ask on cross-examination, can't you measure what damage there would be to Mego in dollars, can't you sue PAC later on for whatever damage may have been caused?
>
> Is there any way of estimating those damages?
>
> THE WITNESS [Michael Bauer, President and Chief Executive Officer of Mego Corp., and President of Ojem]: Well, I guess the potential of a damage suit is there.
>
> However, the only one that would recover, I guess, is somebody other than an ongoing Mego because Mego wouldn't be here.

R. 237; *see also* R. 120 (estimating money damages).

The Bankruptcy Court apparently relied on this factor in granting preliminary relief based on the existence of a serious question that made the merits fair grounds for litigation. *See* R. 262. The only evidence of irreparable injury or a balance of hardship is the possibility of Mego's liquidation, and the substantial investment in time that had been made in the reorganization proceeding. In fact, despite evidence on the availability of damages as an adequate remedy for Ojem, the contracting party before it, the Bankruptcy Court specifically stated:

> On the basis of the record that is before me, I find the possibility of irreparable harm were this contract to be terminated and that information disseminated among the customers in the toy trade.
>
> It is true that I asked questions as to whether or not this harm could be measured in damage in dollars—*this damage could be measured in dollars,* and having in mind that this is a Chapter 11 proceeding that has wound its way through this Court for eleven months or more, and having in mind that this Court did autho-

rize the creation of Ojem and the contract between PAC and Ojem, I'm satisfied that the termination of the contract and the announcement would have a devastating effect that probably could not be measured in dollar damage.

R. 262 (emphasis added). As the Court of Appeals said in *Beck* "this argument puts the cart before the horse. The corporate veil cannot be lifted merely because it would make for 'an efficient and economical administration' of the debtor's estate." 479 F.2d at 419 (quoting *Greenbaum v. Lehrenkrauss,* 73 F.2d 285, 287 (2d Cir.1934)).

Finally, the rule in *Beck* should not be regarded as a hindrance to companies in chapter 11, but rather as necessary to insure the ability of chapter 11 companies to utilize subsidiaries effectively. While Mego presently finds it useful to contend that Ojem's separate status should be disregarded, its arguments would undermine in the long run the substantial advantages that chapter 11 companies reap from their capacity to create truly independent entities with which others are willing to transact. Mego must not be permitted to sacrifice the long-run interests of chapter 11 entities, even if it is now willing to disclaim the reasons that led it to create Ojem in the first place.

Absent proof that a subsidiary is a sham, therefore, the general rule that best serves the interests of bankrupts and creditors alike is that entities that transact business with a nonbankrupt, economically viable subsidiary of a bankrupt can be subjected to the Bankruptcy Court's jurisdiction only when they agree to submit to it. Where they are obtainable, such agreements can be easily stated, and so in general an express agreement should be required. Special circumstances may warrant finding an agreement by inference, *see, e.g., In re Sherman Plastering Corp.,* 340 F.2d 915, 917 (2d Cir.1965) (third party sought Bankruptcy Court hearing), but the burden of proof is on the debtor, and no such circumstances are present here.

SO ORDERED.