**In re Petition of Anthony William BRIERLEY as one of the Joint Administrators of Headington Investments Limited In a Foreign Proceeding.**

**Bankruptcy No. 92–B41453(TLB).**

United States Bankruptcy Court,
S.D. New York.

Aug. 4, 1992.

---

Kaye, Scholer, Fierman, Hays & Handler, New York City by Michael Crames, Jane W. Parver, and Robert B. Bernstein, for petitioner.

Wolf Haldenstein Adler Freeman & Herz, New York City by Eric B. Levine, for Sheldon J. Aboff, PH (U.S.), Inc., Sphere, Inc. and pro se.

Goldman & Hafetz, New York City, for Sheldon J. Aboff and PH (U.S.), Inc.

Rudes, Lax, Berkowitz & Mittman, P.C. by Saul Rudes; and Arnold J. Ross, New York City, for Wertheim Schroder & Co.

## OPINION

TINA L. BROZMAN, Bankruptcy Judge.

Perhaps it is an understatement to label the business holdings of the late Robert Maxwell an international labyrinth. The Maxwell empire embraced two components, what have come to be called in the vernacular the private side companies, that is, those owned by the Maxwell family, and the public side companies headed by Maxwell Communication Corporation plc (MCC), those owned publicly and in minority part by the parent company in the private side chain, Headington Investments, Ltd. (Headington). It is Headington which is the subject of this ancillary bankruptcy proceeding. The precipitous decline of the Maxwell group of companies followed by the patriarch's sudden death late last year spawned insolvency proceedings on two continents—numerous administration and liquidation petitions in England, three chapter 11 cases in this court, one of which has a parallel administration proceeding ongoing in England, and this ancillary bankruptcy proceeding.

The first case filed in this court was the chapter 11 case of Maxwell Newspapers, Inc. (the Daily News) which publishes The Daily News in New York City. Its chapter 11 petition was signed by Sheldon J. Aboff, identifying himself as its vice president and treasurer. It is this same Sheldon Aboff who is spearheading a motion to dismiss this ancillary petition under section 304 of the Bankruptcy Code. He contends that Headington is a stranger to United States and that its administrators thus ought not be permitted to undertake discovery in search of property and in aid of its English administration or to obtain injunctive relief to stop a pending state court suit. Mr. Aboff concedes that subsidiaries of Headington, direct or indirect, have very substantial property here; nonetheless, he says, Headington's administrators must file a separate 304 petition for each of those entities in order to take discovery. The joint administrators, apoplectic at this suggestion, urge that they cannot know, absent discovery, if Headington itself has property here in addition to the interests they allege, if there are more U.S. subsidiaries than those they've already identified and if there is any need to seek relief under section 304 for any subsidiaries, direct or indirect.

## I.

Anthony William Brierley, one of Headington's joint administrators, filed this an-

cillary petition on March 11, 1992. His authority derives from his appointment on December 5, 1991 by the High Court of Justice in England as an administrator under the Insolvency Act 1986. By virtue of his appointment as an administrator, Brierley is a "foreign representative" under section 101(24) of the Bankruptcy Code. Section 304 authorizes a foreign representative to seek (i) to enjoin the commencement or continuation of any legal action against the debtor or the debtor's property, including the enforcement of any lien or judgment, (ii) the turnover of property of the debtor to such foreign representative, or (iii) other appropriate relief. Section 304 had no predecessor under pre-Code law and stands in sharp contrast to section 303(b)(4), for the latter is a full scale bankruptcy case with an automatic stay, an estate, avoidance powers and the like, while the former is a somewhat amorphous vehicle whose shape can be ascertained only in reference to the specific type of relief sought in each case. Brierley's petition asks that in aid of the English administration I (i) enjoin continuation of a state court suit by Wertheim Shroeder & Co. (Wertheim), a New York investment brokerage firm, seeking $650,-000 from Headington in conjunction with the sale of the assets of Headington's wholly owned subsidiary, London and Bishopsgate Holdings (North America) Limited (LBH), including assets of its U.S. subsidiary, London & Bishopsgate International, Inc. (LBI); (ii) enjoin the enforcement of any judgment or the prosecution of any suit to create, perfect or enforce any lien or claim against Headington, its administrators and Headington's property in the United States; (iii) require any persons with possession of Headington's property, none of whom have yet to have been identified, to turn over any such property to Brierley and (iv) grant him discovery of Aboff, Barbara Tilly (Aboff's assistant), and other people with knowledge of Headington's operations and property.

Aboff, PH (U.S.), Inc. (Phusi), Sphere, Inc. (Sphere) and the law firm of Wolf Haldenstein Adler Freeman & Herz (Wolf Haldenstein), joined by Wertheim (collectively, the movants), have moved pursuant to Fed.R.Bankr.P. 1011 and Fed.R.Civ.P. 12(b) for an order dismissing the ancillary petition. Because of the need for expedition in determining whether Brierley is entitled to relief, and at the request or acquiescence of the parties when the motion to dismiss was scheduled, I adjourned the original hearing on the petition to coincide with the motion to dismiss. At the argument on both matters, it first became apparent that there were a few factual questions. When the movants asked to conduct certain limited discovery relevant to the propriety of granting the petition, I granted that request, adjourning the hearing on both matters until the conclusion of discovery. Since matters beyond the petition had been submitted to me, with prior notice to the parties I also converted the motion to dismiss to a motion for summary judgment and invited the parties to submit any additional material in support of their respective positions.[1] At the adjourned hearing, I conducted an evidentiary hearing on only those areas which were in question. What emerged from that hearing was that the material facts are not truly disputed; what is disputed are the legal conclusions which flow from those facts.

The summary judgment motion seeking dismissal of Brierley's ancillary petition is predicated on three separate arguments: (i) that Headington does not reside, is not domiciled and does not have a place of business or property in the United States, as a result of which it is not an eligible debtor under 11 U.S.C. § 109(a) whose foreign representative may seek relief under section 304, (ii) since Headington does not

---

1. I combined the hearings only after I ascertained that the movants did not wish to challenge the petition in any manner other than what they had already raised in their motions to dismiss, reserving, however, the right to argue about the form of an order should I determine to grant the petition. It made little sense, under the circumstances, if I were to deny summary judgment dismissing the petition, to proceed with the filing of an answer by the movants other than Wertheim. (Wertheim had moved and answered; its answer raised no different challenges to the petition than the motion raised.)

have a principal U.S. place of business in this district nor principal assets here, venue does not lie and (iii) the petition is patently deficient and thus fails to state a claim because it does not provide adequate notice of the scope of the relief sought, the grounds for seeking relief or the application of the factors of section 304(c) to the movants. The movants do not challenge that there is a valid foreign proceeding to which an ancillary case might attach or that Brierley is a valid foreign representative of the foreign estate. Neither do they question the fairness of British administration proceedings.

This decision will address both the motion and the merits of Brierley's petition. To the extent necessary, it will constitute the findings required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## II.

Headington, an English corporation, is at the apex of the private side companies, owning not only those companies, but, through subsidiaries, an interest in the public side companies by virtue of its minority interest in MCC, the chapter 11 debtor which has a parallel administration ongoing in London. Brierley and the other joint administrators have replaced management of Headington. Brierley is also the sole liquidator of LBH, which has an indirect controlling interest in LBI. Brierley acceded to this role when LBH was placed into voluntary liquidation in England immediately after the sale of substantially all of the assets of LBH and LBI on February 7, 1992. It is this sale which is the genesis of the state court suit with Wertheim.

### A. The Wertheim Dispute

Although Wertheim's entitlement to the $650,000 which it seeks as a brokerage fee from Headington is in contest, the material facts relevant to the injunctive relief requested by Brierley are undisputed.[2] Through the vehicle of a letter agreement, Headington prior to its insolvency proceed-

ings gave Wertheim an exclusive right to sell its interest in LBH and LBI for a fee of $650,000 payable upon consummation of a sale. Wertheim claims that it was instrumental in drumming up interest among certain officers of LBI (the management group) in acquiring Headington's interest. This resulted, says Wertheim, in the management group's formal offer to purchase Headington's interest in LBH and LBI during the first week in December 1991. Within a day or two, Wertheim was advised by John Dubel, a partner of Arthur Anderson & Co. (Arthur Anderson), that John Talbot, one of his partners, had been appointed as one of Headington's joint administrators. Thereafter, Dubel acted on behalf of Talbot with regard to the sale. (Brierley, too, is a partner of Arthur Anderson.)

Wertheim's contention, unrefuted in this record, is that two weeks later, members of the management group, Andrew Smith and Robert Chender, informed Wertheim that the management group and Talbot had agreed to the purchase of Headington's interests for approximately $14.5 million and that they hoped to close in under two weeks, before the new year. As the old joke runs, that was the good news. The bad news, Wertheim soon learned, was that Headington would pay Wertheim no fee.

Believing that it had produced a buyer in accordance with the letter agreement, Wertheim on December 29, 1991 commenced suit in the Supreme Court of the State of New York against Headington and Talbot alleging that the letter agreement had been breached. Wertheim simultaneously obtained an *ex parte* temporary restraining order intended to lead to a $650,000 attachment upon Headington's property or debts owed to it. A hearing on the requested attachment was scheduled for December 31, 1991.

When the return date arrived, the joint administrators' counsel, Jane W. Parver, told Wertheim's counsel, Saul Rudes, that

---

**2.** The factual scenario underlying the issue of whether injunctive relief ought be made permanent (Wertheim consented to a preliminary injunction) was not part and parcel of the summary judgment motion but of the trial on the merits of the petition. Thus, it is not subject to the standards for granting summary judgment.

the sale would not close immediately and that she intended to seek relief under section 304 in this court. The parties executed a stipulation, so ordered by the state court, vacating the temporary restraint and withdrawing the request for attachment, without prejudice to renew it. Parver agreed to give Rudes 48 hours' notice of the contemplated closing so that he could renew his request for a temporary restraint and seek to obtain an attachment.

On February 3, 1992, Parver gave Rudes the required notice. She also asked Rudes whether Wertheim would forgo seeking to enjoin the sale if $650,000 of the proceeds were placed and kept in an agreed-upon bank account in New York City, pending a determination by this court of an anticipated request for injunctive relief under section 304. Rudes agreed; on February 7, 1992 the sale was consummated and $650,-000 was wire transferred into an account in the name of LBH at National Westminster Bank (NatWest) in New York City, where it remains today.

The agreement between Rudes and Parver was never reduced to writing, although Parver later confirmed in writing that the $650,000 had been placed into an account at NatWest "as we discussed." That Rudes understood something different from what Parver actually said is accepted by both. Rudes described as "implicit" in his agreement with Parver that the $650,000 was to have been placed in escrow with Parver's firm or in an escrow account in the name of an entity other than LBH. He testified that had he known that the $650,000 would be deposited into a bank account in LBH's name, which Headington could reach, he would never have consented to it. Parver swore that there was no agreement to create an escrow and that none was created. Rudes does not contradict her, for he acknowledges that there was no discussion of any escrow or of putting the money into an account held by Parver's firm.

### B. The Need for Discovery

Headington owns over 70% of Robert Maxwell Group plc (RMG), the indirect parent of the Daily News, and a majority share of Mirror Group Newspapers plc (Mirror). Brierley alleges that after Robert Maxwell's death, it was learned that hundreds of millions of pounds were missing from pension funds of RMG and Mirror and that the private side companies had become heavily insolvent with debts in excess of $1.5 billion. Brierley further alleges that well over $100 million from the private side companies, which may include funds belonging to Headington, were transmitted to a bank account maintained in Elmsford, New York; that monies and stock from the private side companies were transferred to brokerage accounts in New York; that the records of Phusi (which Brierley believes was the conduit for transfers from the English companies into and out of the United States) and of other private-side companies are located at Wolf Haldenstein's law offices in New York City; and that records were removed by Aboff from the offices located in Greenwich, Connecticut. Brierley seeks discovery to ascertain if there are, as he believes, assets now located in the United States to recover. Further, he seeks to identify the U.S. subsidiaries of Headington beyond the 32 of which he now knows. He styles Aboff as the hook to unravelling the tangle, alleging that until December 18, 1991, thirteen days after the Daily News filed its chapter 11 petition, Aboff was the chief executive officer of all the privately-held Maxwell companies in the United States. Aboff is further alleged to have been very actively involved at high levels of management of all the private side companies. The ancillary petition recites that the High Court has issued orders freezing Aboff's assets worldwide. As is apparent from his opposition to the ancillary petition, Aboff has not voluntarily cooperated in the English insolvency proceedings.

Barbara Tilly is alleged to have been Aboff's assistant and to have been employed by Maxwell companies for some 17 years. Brierley believes that she has information which will assist him in identifying, locating and understanding the books and records and United States assets of Headington. Although Brierley has named only Aboff and Tilly in the petition he acknowledges that he may seek discovery from

other persons with knowledge of Headington's business and property. It is Brierley's expressed intention to identify tangible assets of Headington located in the United States so as to initiate appropriate turnover proceedings and, if he discovers property belonging to Headington's subsidiaries, to file ancillary petitions for such subsidiaries.

## III.

### A. The Procedural Context

▮ Pursuant to Fed.R.Civ.P. 56(c), made applicable to these motions by Fed.R.Bankr.P. 7056, summary judgment may be granted only where there is no genuine issue of material fact. *Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir.1991). Where the facts in dispute will affect the outcome of the suit under governing law, summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to clearly establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118 (2d Cir.1990).

▮ Albeit that it is infrequently done, I took testimony to fill the gaps in the record to be used in the combined hearing on the motion for summary judgment and on the merits of the petition. Given that a deposition is admissible on a motion for summary judgment, live testimony is equally admissible so long as it is utilized in the same manner. 6 J. Moore, *Moore's Federal Practice*, ¶¶ 56.11[1.–6] and 56.11[8] (2d ed. 1992). Fortunately, those facts necessary to resolve these matters, including those which were the subject of live testimony, were not in dispute.

### B. Eligibility for Relief

#### 1. *The Application of 11 U.S.C. § 109(a)*

▮ Section 109(a) lays out eligibility requirements for a debtor.

(a) Notwithstanding any other provisions of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be *a debtor under this title.* (Emphasis added).

Its eligibility requirements have been held by several courts to apply to section 304 proceedings, that is, those courts have held that the ability of the foreign representative to sustain an ancillary proceeding hinges on the eligibility of the foreign debtor to have commenced a case under title 11. *See In re Lines*, 81 B.R. 267 (Bankr.S.D.N.Y. 1988); *In re Toga Mfg. Ltd.*, 28 B.R. 165, 167 (Bankr.E.D.Mich.1983); *cf. Angulo v. Kedzep Ltd.*, 29 B.R. 417, 419 (S.D.Tex. 1983). Although I have never been called upon to decide whether section 109(a) applies to an ancillary proceeding, in one case, where the parties clashed over whether the requirements of sections 109(b) and (d) encumbered the foreign representative, I held that subdivisions (b) and (d) did not apply, but I assumed that subdivision (a) did. *Universal Casualty & Surety Co. Ltd. v. Gee (In re Gee)*, 53 B.R. 891, 899–900 (Bankr.S.D.N.Y.1985). Part of my explanation for holding that the requirements of sections 109(b) and (d) (which set out eligibility requirements for chapter 7 and 11 debtors) did not have to be fulfilled is instructive here. "[S]ince a 304 case is one which does not administer an estate as such but simply aids a foreign bankruptcy, there is little reason to exclude a debtor ineligible for chapter 11 relief from being the subject of a case under section 304." *Gee*, 53 B.R. at 900.

Suggesting that *Lines* and *Toga* were mistaken in their analysis, Brierley nonetheless steadfastly maintains that even if section 109(a) does apply, Headington

meets its requirements. The proper focus, however, says Brierley, is the one which I in fact utilized in *Gee*. I looked to whether I had jurisdiction and venue to grant the "other appropriate relief," there, discovery. What I concluded follows:

"Although it may not be appropriate in every case to allow a 304 petition solely for the purposes of discovery if there is no property in the United States involved in the foreign proceeding, where, as here, there is a strong nexus with this country and this district, that relief *is* appropriate."

*Gee*, 53 B.R. at 899 (emphasis in original).

Having now reflected on whether the debtor eligibility requirements have been engrafted onto section 304, I hold squarely that they have not. The nexus to which I referred in *Gee* is satisfied by the venue requirements of 28 U.S.C. § 1410. Just as there is little reason to exclude a foreign debtor ineligible for chapter 11 relief from being the subject of an ancillary proceeding, there is equally little reason to exclude an entity ineligible to be a debtor under our laws from being the subject of an ancillary proceeding so long as that foreign debtor is eligible to be the subject of a foreign proceeding under its own laws. The language of section 109(a) itself suggests the propriety of this conclusion, for it declares that its requirements pertain to someone wishing to be a debtor "under this title." But the foreign debtor in an ancillary proceeding is not a debtor in a case under title 11; it is a debtor only under the foreign law. The foreign debtor in a 304 case does not reap the benefits (such as discharge of indebtedness) of a debtor under our laws; it is the foreign representative who is benefitted. The confusion in some of the cases, *Gee* included, emanates from the use of the word "debtor" in section 304, as the Eleventh Circuit discussed in *In re Goerg*, 844 F.2d 1562 (11th Cir.1988). There, the court of appeals reversed a decision which held that a West German bankruptcy trustee was precluded from commencing an ancillary case because the debtor in the foreign case—an insolvent decedent's estate—did not qualify as a "debtor" under the Bankruptcy Code.

The decedent died insolvent but owning property in both Europe and North America. Shortly after his death, a foreign representative was appointed to administer the decedent's property both domestic and foreign. Meanwhile, a probate court in Georgia had appointed an administrator of the assets located in that state. The foreign representative filed a 304 petition in Georgia seeking to enjoin the administrator from prosecuting the Georgia probate proceeding. The administrator argued with initial success that inasmuch as a decedent's estate was ineligible to be a debtor under the Bankruptcy Code, the foreign representative was not entitled to any relief.

The Eleventh Circuit determined that the exclusion of a decedent's estate from eligibility to be a debtor under title 11 did not extend to an ancillary proceeding. In so holding, it alluded to what it perceived as an anomaly in the Code. The definition of "foreign proceeding" found at 11 U.S.C. § 101(23) refers to a "debtor", which is defined at 11 U.S.C. § 101(13) as a person or municipality concerning which a case under this title has been commenced. Yet that same definition of "foreign proceeding" refers to a proceeding "whether judicial or administrative *and whether or not under bankruptcy law*, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension or discharge or effecting a reorganization[.]" (emphasis supplied).

Confronted with what it saw as two possible interpretations, the first, that what it characterized as the narrow definition of "debtor" prevails over the expansive definition of "foreign proceeding", and the second, that the "debtor" in the foreign proceeding refers to a *foreign* debtor, the court opted for the latter, stating, "[u]nder this alternative view, the bankruptcy court has jurisdiction to entertain the section 304 petition provided that the debtor qualifies for relief under applicable foreign law, and

provided further that the foreign proceeding to which the debtor is subject is 'for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.'" *Id.*, 844 F.2d at 1567.

■ I would suggest that the "anomaly" alluded to by the Eleventh Circuit is more apparent than real, for the circuit court did not focus on the fact that a debtor is someone about whom a case "under this title" is pending. If one recognizes that an ancillary petition does not commence a case as such, as the Eleventh Circuit did, *id.*, 844 F.2d at 1567, most of the perceived lack of clarity in the statutory provisions evaporates. The only hurdle remaining with this analysis is that in one context the word "debtor" is used to refer to a debtor under foreign law whereas in most other contexts the same word is used to refer to a debtor under title 11. No doubt, ordinary principles of statutory construction cut against ascribing two different meanings to the same word, *Dewsnup v. Timm*, — U.S. —, — – —, 112 S.Ct. 773, 780–81, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting); *Goerg*, 844 F.2d at 1567, yet it is also a well established canon of statutory construction that a statute susceptible of more than one meaning must be read in the manner which effectuates, rather than frustrates, legislative intent. *Goerg*, 844 F.2d at 1567 quoting *Shultz v. Louisiana Trailer Sales Inc.*, 428 F.2d 61, 65 (5th Cir.1970). And legislative intent could not emerge with more clarity than it does here. That history expressly states that the filing of a section 304 petition does not commence a full bankruptcy case. H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 324, reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6281 (House Report); S.Rep. No. 989, 95th Cong., 2d Sess. 35, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5821. No automatic stay arises nor is a discharge of indebtedness granted. *Goerg*, 844 F.2d at 1568. Nor is any estate created. *See* 11 U.S.C. § 541(a). Rather, section 304 was intended to arm the bankruptcy courts with the maximum flexibility possible in handling ancillary cases in light of principles of international comity and respect for the

laws and judgments of other nations. *See* House Report at 324–25, reprinted at 1978 U.S.Code Cong.Admin.News at 6280–81; *Cunard S.S. Co. v. Salen Reefer Services AB*, 773 F.2d 452, 455 (2d Cir.1985). One of my colleagues in an off-quoted passage has likened the court's prerogative to the molding of appropriate relief "in near blank check fashion ..." *In re Culmer*, 25 B.R. 621, 624 (Bankr.S.D.N.Y.1982). As the *Goerg* court concluded, this articulated legislative intent warrants construction of the statute so as to further rather than stymie the Congressional desire. 844 F.2d at 1568.

That a foreign representative may obtain discovery without proving that the foreign debtor would have been eligible to commence a full-scale bankruptcy case is not nearly so remarkable as the movants deem it. Only a few short weeks ago, the Second Circuit reversed a determination by the district court to deny the request by a foreign litigant to take discovery pursuant to 28 U.S.C. § 1782 (1988) of people resident in the United States for use in the proceedings before a Hungarian court. *In re the Application of Malev Hungarian Airlines*, 964 F.2d 97 (2d Cir.1992). Section 1782 permits the district court of the district in which a person resides or is found "to order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal *or upon application of any interested person ...*" (emphasis added). The Circuit Court described as the "twin aims" of the statute "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts ..." *Id.* at 100. With these aims in mind, the Circuit Court deemed an abuse of discretion the district court's denial of discovery because the litigant had not first sought the information through the foreign tribunal. Reading together 11 U.S.C. § 304 and 28 U.S.C.

§ 1782 one cannot doubt that Congress meant to aid foreign tribunals, be the proceedings before them bankruptcies or litigations. If a litigant can take discovery in the United States just for the asking, there is no sensible reason to impose a requirement that a foreign representative seeking discovery must first prove that the foreign debtor could have been a debtor under our laws.

### 2. If Section 109(a) Applies, Headington Can Meet Its Requirements

■ The discussion of section 109(a) could certainly have ended with part III(B)(1) of this decision. Yet it would be doing a disservice to Brierley were I to so end it since I have concluded that even if section 109(a) applies to a 304 proceeding, its strictures have been met.

■ One basis for eligibility under section 109(a) is a place of business in the United States.[3] Headington employs Mary E. Murtha, an accountant, in New York. She assists the New York office of Arthur Anderson, acting on behalf of the joint administrators, in trying to locate assets of Headington and identifying other privately held Maxwell companies in the United States. She also performs work not under the aegis of Arthur Anderson which is necessary for the preparation of tax returns. Although Murtha's employment agreement with Headington deems her an independent contractor, she testified that this was done at the request of her attorney for tax reasons.[4] Murtha is not a newcomer to the Maxwell scene. Prior to her employment by Headington, she was employed for two years by Official Airlines Guides, Inc., a subsidiary of MCC, in its Greenwich, Connecticut, office. In that capacity she performed substantial work for the private side companies. It was because of her knowledge of the private side companies

that she was tapped by the joint administrators to work for Headington. She now works full-time for Headington, is paid by Headington and communicates regularly with Headington personnel in England. Moreover, she keeps in her office files, books and records which are the property of Headington in which she records and updates information relating to Headington's interests in the United States.

Murtha's activities are a critical component of Headington's business. As a holding company in administration, Headington's identification and marshalling of its assets are essential functions. In the four months just preceding Brierley's request for relief under section 304, Headington has identified, negotiated and collected over $6,000,000 in notes and receivables owed to Headington from various entities located in the United States.

Headington's location in New York City has been widely broadcast to third parties having business with Headington. John Dubel (the fellow who identified himself to Wertheim as the joint administrators' agent) testified that sometime around December 5, 1991, he telephoned all companies having business with Headington in the United States and informed them that he was duly authorized by the joint administrators to act as Headington's chief representative in the United States. In addition to collecting the $6,000,000 alluded to above, Dubel has negotiated a number of contracts on behalf of Headington in New York, has closed a business and has hired Murtha. Whereas the movants attempted to divorce Headington from its administrators, it is black letter law in the United Kingdom that "[i]n exercising his powers the administrator is deemed to act as the company's agent." Insolvency Act 1986, § 14(5).

---

3. I indicated at the hearing that I would permit Brierley to amend his petition, which does not allege a place of business in the United States, to conform to his proof.

4. The parol evidence rule does not render this evidence inadmissible. The movants are not parties to the agreement nor third party beneficiaries thereof and cannot invoke the parol evidence rule to bar a party to an agreement—even

a fully integrated agreement—from explaining, interpreting or contradicting it. See Robert v. United States Shipping Board Emergency Fleet Corp., 240 N.Y. 474, 478, 148 N.E. 650, 651 (1925); SIN, Inc. v. Dep't of Finance, 126 A.D.2d 339, 344–45, 513 N.Y.S.2d 430, 434 (4th Dep't 1987), aff'd, 71 N.Y.2d 616, 528 N.Y.S.2d 524, 523 N.E.2d 811 (1988).

Murtha candidly admitted that she works in space provided by Arthur Anderson, reports in the United States to a partner at Arthur Anderson, that Headington's name does not appear in the building directory or on any signs there and that her telephone is not listed in Headington's name. Nonetheless, by virtue of Murtha's continuous presence and employment and the substantial activities conducted here by Headington, Headington has a place of business in this district, notwithstanding that its premises are contained within the larger premises of Arthur Anderson. *See New York Credit Men's Adjustment Bureau, Inc. v. C.I.T. Corp. (In re Mimshell Fabrics, Ltd.)*, 491 F.2d 21, 23 (2d Cir.1974) (Second Circuit found that the debtor had a second place of business at a related company's offices even though the debtor's presence was not physically indicated in any manner); *In re Carnera*, 6 F.Supp. 267, 269 (S.D.N.Y.1933) (case under former Bankruptcy Act holding a New York City hotel room was a "principal place of business" for a boxer domiciled in Italy although there was no sign on the door).

C. Venue of this Petition is Proper

■ Having determined that Headington has a place of business in New York, I can make short shrift of the venue challenge mounted. There is a special venue statute for ancillary petitions, 28 U.S.C. § 1410. Venue turns on the type of relief requested in the petition. If what is sought is to stay continuation of an action in a state or federal court, venue is proper only in the district where the state or federal action is pending, here, the Southern District of New York. 28 U.S.C. § 1410(a). If what is sought is neither injunctive relief nor turnover of property, venue is proper only in the district in which is located the principal place of business in the United States or the principal assets in the United States

of the foreign debtor's estate. 28 U.S.C. § 1410(c). Since Headington has established that its principal place of business, indeed its only place of business, in the United States is in the Southern District of New York, venue is proper. Given the happy confluence of the tests for venue in this ancillary proceeding, it is unnecessary to consider whether I could have granted all the relief sought by Brierley had venue for a petition seeking one prong of the relief not lain in this district.

D. The Merits of the Ancillary Petition

■ Whereas section 304 is deliberately vague in reference to the relief which may be obtained, subsection (c) is far more concrete in describing the factors which the court is to consider in determining whether to grant that relief. I am to "be guided by what will best assure an economical and expeditious administration" of the foreign estate consistent with six factors, only four of which have any pertinence here:

(1) just treatment of all holders of claims against or interest in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; ...

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; [and]

(5) comity; ...

One of these factors is undisputed, just treatment of all holders of claims. The movants do not contend that the administration proceedings are inherently skewed against American creditors or otherwise unfair.[5]

1. *Processing of Claims*

Wertheim suggests that because it will have to litigate its suit in London, it will be

---

5. The laws of the United Kingdom share the same common law tradition of our own system of jurisprudence. The federal courts have repeatedly granted comity to foreign proceedings where the foreign proceeding was in the United Kingdom or in a country whose laws were derived from the United Kingdom's laws. *See, e.g., Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255 (S.D.N.Y.1979) (Canadian pro-

ceeding); *In re Gercke,* 122 B.R. 621 (Bankr. D.D.C.1991) (British proceeding); *In re Axona Intern. Credit & Commerce, Ltd.,* 88 B.R. 597 (Bankr.S.D.N.Y.1988), *aff'd* 115 B.R. 442 (S.D.N.Y.1990), *appeal dismissed,* 924 F.2d 31 (2d Cir.1991) (Hong Kong proceeding); *Gee,* 53 B.R. 891 (Cayman Islands' proceeding); *Culmer,* 25 B.R. 621 (Bahamian proceeding).

prejudiced and inconvenienced in the processing of its claim. This is a wholly unsupported and conclusory statement. One can surmise that there will be some delay and, if travelling to hearings in England is called for, possibly enhanced costs for Wertheim. But the prejudice and inconvenience of which Wertheim complains is typical of what every U.S. creditor in a sizeable domestic case encounters when it is forced to litigate its claim. As the *Gercke* court aptly noted, "[i]t is doubtful that under § 304 Congress expected a foreign bankruptcy proceeding to be less prejudicial and inconvenient than a United States bankruptcy case before injunctive relief would be granted." 122 B.R. at 621, 629. Wertheim does not posit any particularized harm which will befall it if forced to litigate abroad. Moreover, we unhesitatingly require foreign creditors to litigate in our courts if they wish a distribution from a U.S. debtor's estate. It is thus difficult to label as so prejudicial and inconvenient to U.S. creditors as to warrant denial of injunctive relief that which we require of foreign creditors in our own cases. Finally, our courts have not shrunk from vacating attachments, when necessary, and sending the U.S. creditors to the foreign court to litigate their claims in a single forum along with other creditors so long as the claims processing procedure is fundamentally fair. *See, e.g., Canada Southern Railway Co. v. Gebhard,* 109 U.S. 527, 539, 3 S.Ct. 363, 371, 27 L.Ed. 1020 (1883); *Victrix S.S. Co. S.A. v. Salen Dry Cargo, A.B.,* 825 F.2d 709, 713–14 (2d Cir.1987); *Culmer,* 25 B.R. at 631–32.

So notwithstanding that Wertheim would prefer to litigate its claim in the New York court, since there has been no showing of harm to Wertheim if forced to litigate in London and no showing of unfairness in the claims processing procedure, there is no reason to conclude that this factor tilts in Wertheim's favor.

## 2. *Comity*

▮▮▮ The comity factor warrants some analysis, even though the movants do not attack it head on. Comity is

[n]either a matter of absolute obligation on the one hand, nor a mere courtesy of goodwill, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its law.

*Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95, 108 (1895). As I observed once before

Comity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated. *Cunard Steamship, supra,* at 457; *see Hilton v. Guyot,* 159 U.S. at 202–03, 16 S.Ct. at 158; *Clarkson Co. v. Shaheen,* 544 F.2d 624, 629 (2d Cir.1976); *Kenner Products Co. v. Societe Fonciere et Financiere Agache–Willot,* 532 F.Supp. 478, 479 (S.D.N.Y.1982). Particularly where the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed. *Clarkson Co., supra,* 544 F.2d at 630.

*Gee,* 53 B.R. at 901.

The courts in the United States are not alone in recognizing the need for comity in foreign bankruptcy proceedings. *See Banque Indosuez S.A. v. Ferromet Resources, Inc.,* 1992 B. No. 2900 and 3537, High Court of Justice, Chancery Division (1992) (Hoffmann, J.) (High Court vacated injunction obtained by French bank trading in London which was a creditor of Texas chapter 11 debtor where injunction would have enabled creditor to obtain debtor's assets outside the U.S. bankruptcy process); *but cf. Felixstowe Dock & Railway Co. v. U.S. Lines, Inc.,* 2 LLR 76 (Queen's Bench Division, Commercial Court, 1987) (court continued injunction in favor of English creditors against funds of American chapter 11 debtor subject to right of debtor to apply for U.K. "winding-up order" (liquidation).)

Unlike in many 304 cases, Brierley's petition is not an isolated request for relief in aid of a foreign bankruptcy case. Remember that I preside as well over three Maxwell chapter 11 cases, those of MCC, MCC's indirect subsidiary, Tendclass Ltd., and the Daily News. In England, the Honorable Leonard Hoffmann presides over the parallel administration proceeding of MCC and administration and liquidation proceedings of other Maxwell entities, including those of Headington and Mirror. That these cases are all interrelated is beyond doubt. It has been alleged that a certain core group of executives may well have controlled the empire. It is probable that some or all of the estates have claims one against the other. The American subsidiaries, debtor and non-debtor, are ultimately owned at least in part by British parents, notably including Headington, in administration proceedings before Judge Hoffmann.

This interrelationship is perhaps best illustrated by the fact that in MCC's case, I have already authorized the examination under Fed.R.Bankr.P. 2004 of most of the persons and entities whom Headington's administrators now seek or have indicated they intend to seek to examine. Thus, I cannot view Brierley's request for discovery in the light in which the movants paint it—as an isolated effort by foreign administrators to simply waltz into an American court and seek relief without having shown any relationship to this jurisdiction. This ancillary proceeding is more accurately viewed as but one component of a large, transnational bankruptcy.

Lurking in all transnational bankruptcies is the potential for chaos if the courts involved ignore the importance of comity. As anyone who has made even a brief excursion into this area of insolvency practice will report, there is little to guide practitioners or the judiciary in dealing with the unique problems posed by such bankruptcies. Yet it is critical to harmonize the proceedings in the different courts lest decrees at war with one another result. In this spirit of comity and to the essential end of coordinating the American and British cases, Judge Hoffmann and I have approved in the MCC case a protocol pursuant to which among many other things I have recognized as corporate governance of MCC the joint administrators whom he appointed and he has granted standing to the examiner with expanded powers whom I appointed. Only a day or two ago, Judge Hoffmann reaffirmed the need for the two courts to respect one another when he vacated an injunction obtained *ex parte* by a creditor of MCC (from a judge other than himself) which restrained the administrators of MCC from commencing before me an action under Bankruptcy Code § 547 seeking recovery of a preference from that creditor. In so ruling, he left to my discretion the decision whether or not to apply U.S. law to a transfer made to the creditor with a presence in New York but headquartered in England. *Barclays Bank plc v. Homan (In re Maxwell Communication Corporation plc)*, No. 0014001 of 1991 (July 28, 1992).

But one cannot simply "feel" that comity is warranted. So we turn to a comparison of British and American insolvency law as useful device in helping to arrive at the decision whether or not to grant it. An administration under the Insolvency Act is in its broad contours and vis-a-vis the creditors very much like a chapter 11 case (insofar as the debtor is concerned there is a major difference; the debtor is not retained in possession whereas under our law the debtor is retained unless cause has been shown for the appointment of a trustee under section 1104 of the Code.) An administration is a controlled management of a company that is, or is likely to become, unable to pay its debts. The order appointing the administrators charged them with managing the affairs, business, and property of Headington so as to achieve "a more advantageous realization of the Company's assets than would be effected on a winding up." (Ancillary Petition, Ex. B at ¶ 1.) When an administration order is entered, there arises under § 11 an automatic stay which is generally coextensive with ours under Code § 362 except that it applies to both pre-and postpetition claims alike. All proceedings and enforcement measures

against the debtor are stayed and no judgments may be executed or enforced, except with the consent of the administrator or approval of the High Court. The administrator is authorized under section 14 to do "all such things as may be necessary for the management of the affairs, business and property of the company," including the "power to take possession of, collect and get in the property of the company and, for that purpose to take such proceedings as may seem to him expedient."

If the administrator wishes judicial direction in relation to any particular matter in connection with carrying out his functions, he may apply to the High Court (Insolvency Act, § 14(3).) The administrator is furnished with a statement of affairs prepared by an officer or other knowledgeable person which details the company's assets, debts and liabilities; identifies its creditors; identifies any security held by creditors; and provides other information which may be requested (Insolvency Act, § 22.) Section 23 of the Insolvency Act requires that within three months of the making of the administration order, unless the High Court grants an extension, the administrator must call a meeting of all creditors in order to obtain their approval of his proposals for conducting the administration. The creditors vote on whether to approve the administrator's proposals; if they approve the proposals with modifications, they need the consent of the administrator to the modifications; if they disapprove the proposals, the court may discharge the administration order and take whatever action it deems fit or adjourn the hearing conditionally or unconditionally, or take any other appropriate action. (Insolvency Act, § 24.) Where the majority of unsecured creditors eligible to vote (those who have presented claims which are duly admitted) approve the proposals, they may establish a creditors' committee which is entitled to require the administrator to attend meetings and to furnish it with information. (Insolvency Act, § 26.) Creditors whose claims are not admitted may appeal to the High Court. (Insolvency Rule 2.23.)

Often, the preparation of a scheme of voluntary arrangement will be one of the purposes of the administration. G. Stewart, *Administrative Receivers and Administrators*, ¶ 1111 at 228 (1987) (hereinafter, *Stewart*). A voluntary arrangement involves a proposal to the company and its creditors "for a composition in satisfaction of its debts or a scheme of arrangement of its affairs." *Id.*, quoting Insolvency Act, § 1(1). The administrator may propose the scheme, which must provide for a nominee to supervise its implementation. *Id.* at 228–29. Usually the nominee is the administrator, although the creditors and members voting on the plan may refuse to approve his selection. *Id.* at 229. Where the proposals are approved by the requisite majorities, the company and all creditors are bound, even if they voted against the scheme. *Id.;* Insolvency Act, § 5(2). They may, however, lodge objections with the High Court. (Insolvency Act, § 6). The supervisor of the scheme implements it if it is approved. The administration may continue in parallel, subject to court order. (Insolvency Act, § 5(3).) When the voluntary arrangement has been fully implemented, the supervisor's role comes to an end, and the company's administration, if its purpose was to implement a voluntary arrangement, will come to an end also. *Stewart*, § 1111 at 229.

The other major alternative to a voluntary arrangement is an orderly liquidation. The Insolvency Act provides a comprehensive procedure for the orderly and equitable distribution of a debtor's assets among all of its creditors. General unsecured creditors are treated *pari passu* under section 107 (in a voluntary winding up) or Rule 4.181 (in a court-ordered winding up). The expenses properly incurred in the winding up are paid first, followed by preferential claims such as certain government claims, employee pension plans, employee remuneration and certain other items. (Insolvency Act, §§ 115 and 175; Insolvency Rule 4.180.) Secured creditors are paid the value of their security and, to the extent they are not fully paid, they share *pari passu* with general unsecured creditors.

The congruence of the Insolvency Act and the Bankruptcy Code convinces me

that the comity factor supports a grant of Brierley's ancillary petition. Nothing dictates that the foreign law be a carbon copy of our law; rather, the Insolvency Act must not be repugnant to American laws and policies, which it is manifestly not. *See Gee,* 53 B.R. at 904. The relief sought in this petition is in general incontrovertibly consistent with and ancillary to the administration under the Insolvency Act. As discussed above, there is an automatic stay analogous to that contained in Bankruptcy Code § 362. The injunctive relief sought is in furtherance of that stay. And in a provision which is strikingly similar to our own Bankruptcy Rule 2004, the Insolvency Act at section 236 permits the administrator to conduct discovery of any officer of the company, any person known or suspected to have in his possession any property of the company or supposed to be indebted to the company and any person whom the court thinks capable of giving information concerning the promotion, formation, business, dealings, affairs or property of the company. The discovery sought by Brierley is of the same type as could be granted in London if the individuals were subject to the High Court's reach.

### 3. *Distribution of Proceeds of Foreign Estate Substantially in Accordance with the Order Prescribed by the Bankruptcy Code*

▮▮▮▮▮ In the immediately preceding discussion I reviewed the distributive scheme of the Insolvency Act and its similarity to that prescribed under the Bankruptcy Code. I also reviewed the treatment accorded claims of secured creditors, which mirrors our own. As here, the administrator may dispose of the secured creditor's collateral free of the security interest with the lien attaching to the proceeds of the collateral. (Insolvency Act, § 15.) Wertheim in its opposition to the ancillary petition questioned whether the High Court would treat its claim, if secured under New York law, as a secured claim under the Insolvency Act. Brierley's expert stated, without contradiction, that "[t]he question whether Wertheim has an in rem property or security interest either because of the alleged creation of an escrow fund or by virtue of a claimed equitable lien would be regarded by the High Court as a matter to be determined in accordance with New York State law." This is equally true with regard to Wertheim's claim that the $650,000 is subject to a constructive trust under New York law.[6]

---

**6.** Wertheim's claim that it is entitled to special rights under New York law which English law would not provide is unsupportable in any event because Wertheim does not appear to have special rights under state law. Wertheim offered two theories to support its view of enhanced status under New York law: that a constructive trust should be imposed upon the $650,000 deposit which it characterizes as an escrow deposit and that the deposit was subject to an equitable lien. In New York, the existence of an equitable lien requires an express or implied contract concerning specific property expressing a clear intent between the parties that such property be held, given or transferred for an obligation. *Datlof v. Turetsky,* 111 A.D.2d 364, 489 N.Y.S.2d 353, 354 (2d Dep't 1985), *citing James v. Alderton Dock Yards,* 256 N.Y. 298, 176 N.E. 401, *rearg. denied,* 256 N.Y. 681, 177 N.E. 191 (1931).

Rudes admitted that there was never any discussion of an escrow account with Parver, nor was there a written agreement with respect to the $650,000 deposit except for a letter from Parver confirming that $650,000 had been placed into an account at NatWest as they had agreed. There was no express or implied agreement which rises to the level of clear language constituting a grant by a debtor of a security interest. *Reiber v. Baker (In re Baker)* 48 B.R. 932 (Bankr.W.D.N.Y.1985). Moreover, an agreement to pay a debt out of a designated fund does not operate to create an equitable lien upon the fund or operate as an equitable assignment thereof. *Datlof v. Turetsky,* 111 A.D.2d 364, 489 N.Y.S.2d 353, 355.

Wertheim's claim of entitlement to a constructive trust is equally unavailing. As the Second Circuit Court of Appeals has recently stated, a party claiming entitlement to a constructive trust under New York law must ordinarily establish four elements:
(1) a confidential or fiduciary relationship;
(2) a promise, express or implied;
(3) a transfer made in reliance on that promise;
(4) unjust enrichment.
*In re Koreag, Controle Et Rivision S.A.,* 961 F.2d 341, 352 (2d Cir.1992). When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. *Id.* It is clear there is no confidential or fiduciary relationship between Wertheim and Headington or its subsidiaries. Particularly in view of the litigation that had

Wertheim also argues that it would have enhanced rights under U.S. bankruptcy law had Headington commenced a chapter 7 or 11 case and that it may not have those rights under the Insolvency Act. The short answer to this is that section 304(c)(4) does not command that the distributive scheme wholly replicate ours.[7] What it directs the court to consider is whether that scheme is "substantially in accordance" with that which we employ. And it is. Were the foreign scheme repugnant to some fundamental American legal principle, this factor might warrant refusing the injunctive relief. *See In re Papeleras Reunidas, S.A.,* 92 B.R. 584 (Bankr.E.D.N.Y. 1988). As it is not repugnant, but substantially in accordance with our own system, this factor cuts in favor of granting Brierley's ancillary petition.

**E. An Injunction is Warranted to Protect Property Involved in the Administration Proceeding**

■ The purpose of an ancillary petition is to prevent the piecemeal distribution of assets in the United States by means of legal proceedings initiated in domestic courts by local creditors. *Victrix* 825 F.2d at 713–14; *Cunard S.S. Co.,* 773 F.2d at 454–55. In furtherance of that purpose, Brierley seeks to enjoin all suits against Headington, the administrators and Headington's property. For the most part, the relief which Brierley seeks as against Wertheim is in furtherance of that purpose as well.

Specifically, the relief which the ancillary petition seeks against Wertheim is a permanent injunction prohibiting Wertheim from continuing its existing state court action, continuing or commencing any other action against Headington, the joint administrators, or Headington's subsidiaries, direct or indirect, or against property owned or controlled by them, that was or could have been commenced prior to the filing of the ancillary petition, or to recover a claim against Headington, Brierley or Headington's subsidiaries that arose before the filing of the ancillary petition.[8] But as I will

---

commenced between them, they stood in an ordinary, arms-length commercial relationship.

However, the lack of a fiduciary relationship between Headington or its subsidiaries and Wertheim does not automatically defeat Wertheim's claim of a constructive trust. New York courts have consistently stressed the need to apply the doctrine with sufficient flexibility to prevent unjust enrichment in a wide range of circumstances. *Id.* The New York Court of Appeals has expressly stated that a person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship. *Simonds v. Simonds,* 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359, 363, 380 N.E.2d 189, 194 (1978). The purpose of imposing a constructive trust is the prevention of unjust enrichment. *Id.*

What is fatal to Wertheim's theory is the lack of a promise, express or implied, to hold the $650,000 in escrow. Headington did no more and no less than what Parver represented it would do. Thus, there was no unjust enrichment.

7. It appears, however, that the Insolvency Act would afford similar relief to that which Wertheim primarily claims it is entitled here. *See* Insolvency Act § 115 and the discussion in *Stewart* ¶ 1115 of administration expenses. It is impossible from this factual record to determine whether Wertheim would actually have an administration claim under the Bankruptcy Code but such a determination is to be made under British law in any event.

Wertheim's "earmarking" theory does not withstand scrutiny under our law. The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a transfer of an interest of the debtor in property. *In re Bohlen Enterprises Ltd.,* 859 F.2d 561 (8th Cir. 1989). The doctrine is asserted as a defense to a preference action. In every earmarking situation there are three necessary dramatis personae. They are the "old creditor", (the pre existing creditor who is paid off within the 90 day period prior to bankruptcy), the "new creditor" or "new lender" who supplies the funds to pay off the old creditor, and the debtor. When new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying off the old creditor, the funds are said to be "earmarked", never part of the debtor's estate, and therefore the payment is held not to be a voidable preference. *Id.*

The earmarking doctrine is completely inappropriate here because there is no new creditor lending "earmarked" money to the debtor for the purpose of paying off an old creditor. In addition, there is no claim of voidable preference. Wertheim has cited no authority nor rationale to support its proposition that the doctrine has currency here.

8. Notice that this includes a stay of suits on postpetition claims, which would not be automatically stayed under section 362. Under § 11 of the Insolvency Act, such suits *are* automati-

discuss below, the injunctive relief for which Brierley asks is too broad to the extent that he wishes injunctive relief to protect subsidiaries, direct and indirect.

If I find that the factors contained in section 304(c) militate in favor of granting an ancillary petition to best assure an economical and expeditious administration of the foreign estate, I may, pursuant to section 304(b)(1) enjoin commencement or continuation of an action against the foreign debtor with respect to property involved in the foreign proceeding or against the property itself. Where turnover of property is sought under section 304(b)(2), in contrast, the statute refers not to "property involved in" the foreign proceeding, but to "property of such estate." In the latter situation, as we have been recently instructed by the Second Circuit, there must be "an antecedent determination of property interests as a condition to the turnover of property to a foreign representative." *Koreag*, 961 F.2d at 348. But Brierley does not seek such relief with respect to the $650,000 contained in a New York bank account. He seeks only an injunction preventing continuation of Wertheim's state court suit.

So long as the laws of the foreign jurisdiction are not repugnant to our own, there is a distinct judicial preference for deferring to the foreign tribunal litigation respecting the validity or amount of claims against the foreign debtor. *See, e.g., Cornfeld*, 471 F.Supp. 1255 (dismissing corporate officer's indemnification action against Canadian debtor on condition that debtor and its liquidators waive any procedural defense which might bar officer from asserting claim in Canadian bankruptcy proceeding); *In re Lines*, 81 B.R. 267 (enjoining under section 304 commencement or continuation of action against trust fund in which liquidators had an interest); *Gercke*, 122 B.R. 621 (enjoining under section 304 action pending in local court to reduce to judgment claim against debtor in British

administration proceedings even though creditor agreed not to enforce any judgment obtained).

In *Gercke*, the creditor argued that because it would not enforce any judgment obtained, it was not affecting "property involved in" the foreign proceeding, as a result of which, the argument ran, the bankruptcy judge was without power to enjoin the suit under section 304(b)(1). The bankruptcy judge disagreed with this analysis because "fixing the amount of [the creditor's] claim in the [American court] would affect the amount of the claim allowable against the property involved in the United Kingdom insolvency proceeding...." He noted, however, that even if the creditor were technically correct in its narrow interpretation of section 304(b)(1), he was free to grant the injunction as "other appropriate relief" under section 304(b)(3) in order to assure an economical and expeditious administration of the estate, as section 304 commands. I am in full accord with that analysis. Harm to the estate exists from the failure to grant injunctive relief in the "form of disruption of an orderly determination of claims and the fair distribution of assets in a single case." *Gercke*, 122 B.R. at 626; *Salen Dry Cargo A.B.*, 825 F.2d at 713–14. The Headington administration is a complex one and decisions in that case may have ramifications in related cases before Judge Hoffmann and, possibly, myself. Centralization of the Headington case in one forum is therefore particularly important. Helter-skelter litigation of claims at times and places dictated by the claimants could play havoc with the orderly progression necessary to administer a case such as Headington's. Accordingly, an injunction permanently prohibiting suits against Headington, its property and the administrators arising out of claims which could have been asserted prior to the filing of this ancillary petition is warranted under section 304(b)(1) or (b)(3)

cally stayed. This difference between the Bankruptcy Code and Insolvency Act is not significant, however, in light of the fact that an American debtor can remove an action on a postpetition claim brought in a forum other than the bankruptcy court to the bankruptcy court. *See*

28 U.S.C. § 1452(a). Given the breadth of the stay under the Insolvency Act and its provisions for relief from that stay (also contained in section 11), I am comfortable with issuing an injunction which comports with English, rather than American, law.

with respect to Wertheim and others alike so as to best assure an economical and expeditious administration of Headington's estate.

 What Brierley is not entitled to is injunctive relief with respect to suits against subsidiaries and their property.[9] He attempts to blur the distinction between a claim against a subsidiary (as well as entitlement to the surplus in an estate after its liquidation) and a claim to specific property. It is well settled in this circuit that ownership of all the outstanding stock of a corporation is not the equivalent of ownership of the subsidiary's property or assets. *Feldman v. Trustees of Beck Industries, Inc. (In re Beck Industries, Inc..)*, 479 F.2d 410, 416 (2d Cir.), *cert. denied*, 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973); *In re Gobel, Inc.*, 80 F.2d 849, 851 (2d Cir.1936); *In re Stein & Day, Inc.*, 113 B.R. 157 (Bankr.S.D.N.Y. 1990). Were a creditor trying to seize the stock of a subsidiary, injunctive relief might be appropriate, since the stock is plainly Headington's property. Similarly, were a creditor of a subsidiary embarking on some action which substantially threatened the ability of Headington to sell stock of the subsidiary, an injunction might be appropriate. But a blanket injunction preventing suit against all of Headington's subsidiaries, direct and indirect, is not proper. The automatic stay which arises in the United Kingdom is no broader than ours in this regard; it protects the property of the particular company in administration. Significantly, Brierley's expert testified that the assets of a company in liquidation, as some of Headington's subsidiaries are, are impressed with a statutory trust in favor of all its creditors. Thus, it is patently clear that Headington, except where it is the sole creditor or the subsidiary is debt-free, cannot plausibly be considered the owner of the specific property of the subsidiary. If this sounds in some manner too harsh, Brierley has a remedy. He may commence an ancillary petition for any subsidiary for which he is an administrator or liquidator in order to obtain relief necessary to aid the insolvency proceedings of that subsidiary.

### F. Discovery is Warranted

 Earlier in this decision I discussed Brierley's need to conduct discovery as well as the provisions under the Insolvency Act which permit him to conduct discovery. In *Gee* I determined that the filing of a petition seeking only discovery is permissible and consistent with the "other appropriate relief" of section 304(b)(3). Since Brierley is not certain he knows the identities of all Headington's subsidiaries or of all Headington's property and since he does not know whether he has assets in the American subsidiaries which ultimately may be available to Headington and which need protection via the vehicle of additional ancillary petitions, discovery will unquestionably further the economical and expeditions administration of Headington's estate. There need not be identifiable property in the United States for discovery to be granted. It is enough that venue can be satisfied in some manner as it has been here. If there is good reason to believe that there may be property in the United States, then, as I held in *Gee,* discovery ought be permitted to ascertain the existence of such property, which may consist of a claim or of something more tangible. *See In re Metzeler,* 78 B.R. 674 (Bankr. S.D.N.Y.1987). Accordingly, Brierley's request for leave to take discovery of Aboff and Tilly is granted.

 If Brierley is seeking blanket authority to examine all other as yet unnamed persons who may have information which he deems relevant, a matter which is not entirely clear from his petition, he may not have it. Just as I would want to maintain some control over the extent of discovery conducted under Bankruptcy Rule 2004, I believe I ought exercise the same restraint in this proceeding. Under section 236 of the Insolvency Act, a court order is necessary to summon a person to give testimony relevant to the company's administration. It would seem, therefore, that the High Court would also look askance at an

---

9. The Wertheim action is a suit against Headington, not its subsidiary.

order which gives unfettered authority to the administrators to conduct examinations. Implicit in this discussion, of course, is the notion that I will entertain additional applications for discovery so long as the identity of the individual and the need for the examination are established.[10] Unless there is shown some compelling reason to dispense with prior notice to the person sought to be examined, any such applications are to be made on prior notice.

G. Request To Strike Inadmissible Matter

■ The movants have suggested that most of Brierley's answering affidavits go to great lengths to attack the movants personally, rather than address the real issues inherent in their motion to dismiss, and that they are inadmissible. I am not persuaded that the affidavits are weighted to the degree expressed by the movants with inadmissible matter. Because much of the matter is admissible, I decline to strike the affidavits. The remedy which I have invoked is to disregard the improper material. *See Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 579 (2d Cir. 1969).

## CONCLUSION

The motion for summary judgment dismissing the ancillary petition is denied. The relief requested in the petition is granted with the limitations discussed earlier. The petitioner is to settle an order consistent with this decision.

---

**10.** This disposes of the movants' argument that they had inadequate notice of what discovery is sought and whether it will be burdensome.